Department of Health and Human Services, United States Department of Health and Human Services, and so this case is about the sufficiency of that evidence on remand. Your Honor, we believe that the court got the law right in the first remand redetermination or the remand opinion. I can't speculate exactly what the court was affirming in its one-page order. I assume that the chief judge is right. Well, if the court articulates what the law is, you've got to assume that they haven't changed their mind between the remand and the final judgment. I agree, Your Honor, and we filed a motion for reconsideration below because we were struggling with reconciling, on one hand, the remand opinion, which, as I stated, got the law right in requiring Commerce to do a more searching analysis as to what the commission actually determined in its material injury determination, and the one-page order, which didn't cite to what substantial evidence because below we don't believe that Commerce has the substantial evidence to support a conclusion that the ITC reached a material injury determination with regard to coil rod and the domestic production of coil rod in the United States. Now, does your case hinge on whether or not we conclude that the order itself was ambiguous? We've got a string of cases that talk about ambiguity, and one can say they're different. As I recall, they're typically when the department is trying to expand its application of a more limited order, which we conclude is ambiguous. But what is your position on the law there? I agree with you. I think that the most fundamental part of all those cases is an understanding that the Tariff Act requires both the material injury determination and the unfairly priced imports determination. And what those cases stand for is the idea that where Commerce is trying to include a product within the scope of the order, and that product is not specifically included by reference, Commerce is required to do a more searching analysis to ensure that. What if the order specifically said coil rods? Would we be here at all? Would you say even though there's clearly – even though your position might be – would be the same, that this was never part of the investigation, that they didn't do a material injury inquiry, would you say it's still over for you because of the – because it's explicit? Yes, Your Honor. If coil rod was included in the specific language of the scope of the order from the time that the petitioning coalition filed their petition, what I submit to this court is that the three producers of coil rod would have come in and made their position known. The International Trade Commission would have sent questionnaires to those parties to acquire data with regard to their health. Now, you yourself would not have come in because you didn't get reclassified until later on in the process, right? It's true. However, we were also at the time – we knew those companies produced coil rod. We were, I think, at the time purchasing from some of those companies. And so it is likely that Patterson would have known at that time that the products could be covered by the scope of the order. Are you classified under 5051 now? Yes, Your Honor. According to Customs CF-28 – CF-29 notice of action, which is available at the joint – Right. And do you have a problem with that classification? Well, Your Honor, I think our problem is that the classification is slightly wrong in the sense that it's just applying, you know, a steel threaded rod with threads. And I think we still believe that the coil rod should come under anchors and gravels because it's used in the concrete accessories market that way. However, we're not challenging Customs rolling in this case. Really what you do in these sort of cases is you go to Commerce and say, please provide us with a scope rolling that will tell Customs how best to implement your order. I'm just trying to follow because you're not – you don't appear to be challenging the classification under 5051, which is a successor subheading of 5060.  And 5060 was, in fact, listed in the petition here, wasn't it? That's correct. But the fundamental issue is that we're challenging Customs extending in the duties based on their tariff classification, which then loops in the Commerce challenge below. What we're saying is that Commerce should instruct Customs not to assess duties on this because the material injury determination was not on this subset of steel threaded rod. In fact, if Your Honor will recall, the order is on certain steel threaded rods. So in the ITC's material injury determination, the ITC recognizes there are myriad other steel rods, steel threaded rods that are not included in the domestic industries petition. To make more explicit what I think you're saying, so make sure I'm right about this, is that the fact that you're classified under 5051 and the fact that the scope order here references 5051 doesn't mean you're automatically in the scope order because the scope order is clear that not everything in these various classifications is going to fall within this order. Yes, Your Honor. I apologize for... I just wanted to get to the heart of it. You were getting there. I was getting there. It's just been taking too long for me. I understand, Your Honor. And Your Honors will recall that Commerce often says that the HCS codes in the scope of the order are not binding. It's illustrative more than anything else. And so to answer Your Honor's question, I don't think that that's the size of the scheme. Right. Steel threaded rods, the term, that is kind of an umbrella term, isn't it, for a category of product? It's not really channeling towards a very specific product and only a specific product, but it's really an attempt to cover a category of product. Is that fair to say? I think in part, yes, that it's fair to say, but in part, it is channeling to a specific product. In fact, the domestic industry... Well, it is governed by the physical characteristics that are described. Right. The physical characteristics, uses, and the participants in the industry, including those exporters in foreign countries. I guess that's a question, which is to what extent do the uses that are described in the petition, what relevance do they have in trying to understand the proper scope of the overall order? There's an opinion this court issued a couple of years ago called the King Supply, which, I don't know, to me, made it pretty clear that end-use restrictions are disfavored. We're only going to give them weight when it is super crystal clear that there is an attempt by commerce to exclude certain kinds of products that would otherwise be covered based on physical characteristics based on particularized uses. And for that subcategory, they'll get knocked out, but the language has to be very clear to that effect. Maybe the language you're working with here isn't nearly as clear as King Supply would want it to be. I agree, Judge Shen. I think, however, King Supply was analyzing the specific scope language. What we're talking about when we're talking about uses is the analysis that we're asking this court to require commerce to do, which is look at the International Trade Commission's record, review their findings, look at what domestic industry they examined. Because the uses are important for the International Trade Commission because it helps them find exactly what industry and what product they are examining and who they're examining. Can I just – I'm sorry to interrupt, but it's involved with what you're saying. I'm a little confused because I thought what you were asking for in this case and what this was about was sort of what we talk about in K-1. Now, uses is a K-2 factor, right? So why are we even – you haven't asked for a K-2 analysis, my understanding is. Why are you talking about K-2? Because in the International Trade Commission's material injury finding, the commission is required to explain what the domestic-like product is. And so in the discussion of domestic-like product, they're explaining what is this product used for, what is it not used for. So you're kind of saying our factors don't really make any sense to the – I mean, you're creeping the K-2 factors up into the analysis of K-1. No, Your Honor. I respectfully disagree. What I'm saying is that the K-1 requires commerce to look to what the commission decided. And that means the holistic commission determination, not just the physical descriptions that the commission said, this is the scope that commerce sent us. Because frankly, that's sort of – Does the K-1 say we need to look at the descriptions of the product? Yes, but that's part of what the domestic-like product section of the International Trade Commission's final determination is all about, which is – You would define descriptions of the product to include uses of the product, not just physical description of the product. Sure. What we're saying is that this goes all the way back to first principles in trade law, which requires that there be a material injury finding with regard to a specific domestic industry. What is that domestic industry is really what our case is about. And what we're saying is that the domestic industry that was examined was not the coil rod domestic industry. Right, but what if – I guess commerce will come up and say, well, the domestic industry is some domestic-like product. That's the catchphrase in the statute. And domestic-like product is, again, an umbrella term. It's covering a category of products, and they're all sharing some similar characteristics. And there's nothing in the statute or the law that requires you to chop up and slice the category of products into individual little subcategories of products and then go and find a specific material injury for every little subcategory within the overall category of domestic-like product, which seems to be what you're asking for here. But, Judge Chen, this is somewhat what the International Trade Commission is doing when it's making its material injury finding. There are some times where cases go from commerce and the unfairly priced imports dumping analysis that include a scope that's a broad scope. When it goes to the commission, the commission may split it up into six domestic-like products. And the commission may say, for four of those products, we find material injury. For the other two, we do not. And those other two are not then included in the final order, even though they may have been within the scope language. And so what we're seeing is that the commission does do that analysis. And here it could have done that analysis had the domestic industry who petitioned for duties come in and said, we'd like this covered. And the commission would have sent questionnaires to those parties, and they would have received data from those parties. They would have discussed the concrete accessories market. And, oh, by the way, it probably would have been in their favor because, as you'll see from the record, there's discussion about how that particular section of the coral rod industry was suffering. It may have actually been in their favor to bring them in, and it would have maybe helped them out with their material injury determination. And the fact is that the IDC did not collect pricing information with regard to domestic prices vis-à-vis import prices. The domestic petitioning companies could have come in and said, compare these two products, coral rod import and coral rod domestic products, because we want these things covered. This price would have been vastly different than the prices that they examined, but it could have showed. I'm just trying to figure out what's the standard you're asking for. Are you asking for the ITC to conduct a material injury analysis for every species of product within the overall genus category of domestic life product? I'm just trying to understand, what is the standard that you want? What I'm asking for is for you to say to Commerce, where and where it does not specifically cover a subset of product, and it is therefore – Or specifically identify, I guess. And therefore it's ambiguous. Once it goes into K1 factors and starts analyzing the commission's determination, it needs to look at the entire commission determination, because that is the fundamental authority for even applying duties in the first place. It may not only look at what the scope language is, because it's going to be the identical scope language that it's already interpreting. What analysis is that? And so what we're saying is, if the genesis of your authority to apply duties is the statute, which requires two things, material injury and unfairly priced imports, you've got to analyze what the material injury was on before you apply duties. If you don't, then it's contrary to law. I agree with you. We can't just look at the language of the order itself, unless it specifically says coil rod. We have to go to the K1 factors. Right. But again, to harken back to what I heard earlier in the argument, it sounds like you want all of these source materials investigations to – you want us to evaluate in K1 everything that's designated in K2. No, Your Honor. The K1 factors are the commission's material injury determination, which includes various things like channels of distribution. It includes what the uses are. Those are K2 factors. It's K2 factors. Those are K2 factors, right? Many of them are K2 factors. Expectation of the ultimate purchase are K2 factors. And that is in commerce parlance. However, when you're in the K1 factors and you're looking specifically at what the commission determines with regard to their material injury findings, you've got to analyze all of it. And here you have evidence that no parties received questionnaires, no parties provided data, and there was no specific mention of the market in which coil rod was sold. And in fact, had they actually – had the Domestic Petitioning Coalition intended to cover it, there would be myriad evidence there and we'd be out of luck. What I would say to this Court is we wouldn't be here if that were the case because the entire commission determination would have included data. You've exhausted your rebuttal time. We'll restore you three minutes. Thank you, Your Honor. I'm going to go back to the government now. Ms. Dunthorne, you're going for 12 minutes? Yes, Your Honor. Okay. May it please the Court? The United States Department of Commerce's scope determination is supported by substantial evidence and should be upheld. It's a little hard here to evaluate whether or not it's supported by substantial evidence where the district court – we know nothing about the district court's analysis or what satisfied the Court of International Trade in terms of substantial evidence, right? Well, I understand that the court's determination on the remand is limited. However, this court conducts a de novo review and there's no question that the Commerce's remand contains evidence sufficient for this court to find that it's supported by substantial evidence. How? Well, you know, one of the things – the only thing you point to about the petitioner, Volkin, for example, selling coil rod during the period of the investigation is a CEO affidavit that says, in the past we sold coil rods. How can that be substantial evidence for your determination, the government's determination, that they sold it during this two-year period? He didn't say anything about the two-year period. Nothing in the affidavit says anything about the two-year period. Yet your fact-finding is exclusively based on his affidavit. So how can that be substantial evidence? I would say two things. First of all, the fact-finding is not totally based on his affidavit. There's also evidence in the record that the petition included Chinese companies that made this coil rod. And you said you obtained that, as I understand it, by currently going on their website to ask – because this was not in response to the petition. You went on their website and ascertained that they advertise currently that they sell coil rods. How does that establish that coil rods were sold by these people during the two-year period of the review? Well, respectfully, Your Honor, we don't need to establish that because the question is, was the ITC investigated a domestic-like product? It does not need to be exactly the same as long as it falls within the physical description of the scope. Here, the ITC defined the domestic-like product – Wait. You said as long as it fits in the physical description of the scope. But that's not what the regulation says. The regulation doesn't say if it falls in the physical – you've added the word physical description. And that, by the way, is a K2 factor, not a K1 factor. The regulation provides the description. The descriptions of the merchandise. It doesn't say the physical description. It says the descriptions of the merchandise. I've seen scope orders that expressly incorporate use, particular uses. Certainly, that use would then be part of the scope order. They have, Your Honor, but that, as Judge Chen pointed out, that use is disfavored. The reason that Commerce – What's disfavored when it's not in the order? But no opinion of ours, the king supply case that you don't import it in when it's not there. But if the scope order itself articulated a particular use, that would be relevant because that would be part of the description of the merchandise. That's right, Your Honor. In this case, neither the Less Than Fair Value investigation nor the ITC included use in the description. But what the description – and we'll, I'm sure, agree on this – certain steel-threaded rods, not all steel-threaded rods. But certain steel-threaded rods. That's what the order says, right? It does say that, Your Honor. But these steel-threaded rods at issue here, there can be no question, and it's not disputed by Patterson, are covered by the description in the Less Than Fair Value investigation in the scope determination. No, but the order is limited to certain steel-threaded rods meeting these characteristics, not all steel-threaded rods meeting these characteristics. So this is not included in the appendix, but it is part of the record. Excuse me, Valerie, could I get you to hand this to both counsel? This is the initial determination of the ITC. So it is one of the K-1 factors. We're supposed to look at all determination of the Secretary and the Commission. And so this is one of the things we are supposed to look at. And it is contained in the record, but it wasn't in the appendix. That's why I printed out a copy to include the relevant pages, because I wanted to ask you some questions about it. So my question to you about this is, under the classification heading on page I-2, the subject product, it goes through physical characteristics and uses, then it has manufacturing process and production employees, and I'm looking in particular on I-5. Are you with me? I am, Your Honor. Okay. So the first full paragraph, with regard to their production and related workers, all but one of the responding producers reported that they produced products, other products, using the same equipment and machinery and production-related workers that they used to produce threaded rod. Other products other than the threaded rod at issue. Reported products include partially threaded rod, stainless rod, alloy rod, anchor bolt, coil rod. This is the ITC's determination that the same machinery and equipment is used to produce not only the certain steel threaded rods at issue in the order, but other products, and they explicitly named coil rod. So that's not the end, though, because I want to go to the next one, because then I'm going to ask you to explain why coil rod is now going to be part of certain steel threaded rod when the ITC has clearly included language saying it's not. Let's go to 2, Roman numeral 2-3, the same report where it says production alternative. Seven of the eight responding producers reported that they produced other products using the same equipment and machinery used to produce threaded rod. Reported products include partially threaded rod, stainless rod, alloy rod, anchor bolt, and coil rod. So, you know, I don't know. It looks to me like the ITC's determinations are unequivocally based on the notion that coil rod is not certain steel threaded rods as are being considered as part of this investigation. I don't necessarily agree, Your Honor. I don't know what coil rod is a phrase that is not defined here. I mean, that, I think, is the heart of the issue. What is coil rod? We don't, it's an industry term that the petitioners are using. The reason that we look to specific descriptors is because you can look at the descriptor and say threaded steel rod falls within the definition by the ITC. Well, the industry recognizes it as a label because seven of the eight responding producers reported that it was a different product than the product at issue. So, I pulled the questionnaire because, you know, we didn't include those in the appendix either, but they seem relevant. And the questionnaire actually says, does your firm produce other products, other than the ones covered by this order, on the same equipment and machinery, no or yes? And the seven of the eight defendants say, yes, we produce other products other than the certain steel threaded rods, and they listed coil rod as one of the other products that they produced. So, I don't understand. The entire industry seems to recognize that coil rod, all of your industry, seven of your eight industry reporters recognized that the coil rod was a different product than the product contained within the scope. The ITC expressly acknowledged it as well. Why doesn't that establish de facto that coil rod is not certain steel threaded rods within the meaning of the order, since the K1 factors require us to look at exactly these documents? Because whatever they found in this preliminary information here, when they ultimately made their determination, they based it upon physical characteristics that include this product. And no one from this alleged coil rod industry challenged the ITC's final determination on those grounds. Why would they challenge the ITC's determination on that grounds? The ITC, in all of its reports, said coil rod is not included. So, why would those industry participants feel the need to come in and challenge the scope when they're operating under the belief, based on all of this, that it's not included? And when even the seven of the eight domestic producers came in and said coil rod is something different. But then, when Commerce wrote its scope to include the physical characteristics of the product, that was the time when the petitioner should have said, slow down, the scope order as written is inappropriate, it's too broad. You've included something that is a different product. And no one did that, because there was not necessarily an understanding that this was a distinct product. But the description that was adopted is identical to what's in this ITC investigation. The same exact description is here. They say certain steel threaded rods meet this description. Despite that, they then go on to expressly indicate that coil rod is a different product, not covered by the order, even though it would otherwise be included. You mean expressly in this document that you handed? Yes. But it's not listed in the exclusions that are written? Just because the words coil rod are included here. Is there some evidence in the record to support what you're saying? You're saying perhaps the industry doesn't recognize these two words, coil rod, to be equivalent to what Mr. Patterson is selling, right? You're saying maybe there's some confusion in the industry about what these words indicate. Is there some substantial evidence or any evidence in the record that I could use to say, well, then I've got to defer because Commerce found, or the ITC found, that there's confusion over what coil rod is. They found in the scope determination, there's evidence from the petitioners that they consider coil rod to be part of the same industry. That they've made it in the past, that there are Chinese companies that are covered by the petition that make it. They don't consider it to be a distinct coil rod industry, that it's all part of the – I don't think that anybody is suggesting that it can't be part of the same industry. I think the question is, is it certain steel threaded rods, which were what is the order covering, or is it not part of the definition of certain steel threaded rods? Because partially threaded rods would be part of the same industry, but they're excluded. Right, because they're not covered by the description in the order. And the way that Commerce and the ITC have defined the industry in this ruling is based upon the physical descriptors. And so it would cover the steel rod. No, unluckily for you, your time is not yet up. No, we started you at 12. Oh, sorry. You know, the other thing is, and this is a point of sort of general interpretation that I'm trying to figure out. It really isn't quite so specific to this case. But suppose that an entire investigation was done in the silverware industry looking at forks. And there was material injury determination, everything, and a duty order was produced. And the physical description of the duty order said, made of steel, containing a handle, three prongs. The prongs, you know, the prongs itself are half as wide as the gap between them. All right. And now all of a sudden John Deere comes along and is going to import into the United States pitchforks for the farm industry. There's nothing at all in the duty order other than the physical description. Probably the government wouldn't even come in and say they're part of the same industry or covered by the same, you know, anti-dumping injury determination or anything else. But how could you not? You all want me to rely exclusively on the language in the order. That's one of your arguments to us. But the example I just gave you, the farming industry would fall prey to physical characteristics, which were described, but nonetheless everyone would agree don't cover the same prongs. Your Honor, if the scope was written so broadly that there was not a size of size prong, that it would cover eating forks and pitchforks, presumably when that FR notice went out and people were unnoticed, they would challenge the scope of the less than fair value investigation for including pitchforks and not having a specific enough scope. Even though everything the government was talking about maybe in the petition was about silverware and using, you know, eating utensils and it's clearly a whole different market and everything else, you still think that the physical description alone should have put the pitchfork companies of the world unnoticed in that scenario and that if they didn't come in, they're at their own peril? Well, I do think they do. And if they hadn't, but everyone agreed, the domestic industry agreed this was not intended to cover pitchforks, then they could do a changed circumstance review and say amend the scope. Everyone agrees this was never meant to cover pitchforks. There was an error by Congress by not including a size component that we didn't catch in the less than fair value investigation, but we all agree. That's not the case here. The petitioner here believes that Patterson's rod should be covered by this order. How do you know that? Well, they, because they, in this scope investigation, they have, well, they're arguing on my side. I know, but what's the evidence that they intended the petition to extend to coil rods? Well, they included Chinese companies that make coil rods. But every one of those companies also makes the other kinds of steel threaded rods. Not all, right? I mean, isn't that right? And the evidence produced in this scope order, in this scope investigation, where they say that they didn't, they intended, that they had made coil rods in the past and that they could do in the future. Remember, the ITC's investigation does not have to be on the exact same product.  It needs to be on a domestic-like product. The problem here, the entire record, to me, screams this is a different product. Seven of your eight domestic producers identified it as a product other than the one covered by the scope. Therefore, it didn't produce, for example, any price data or any other manufacturing costs for you in those questionnaires because they said this is an other product. We happened to make it on the same machinery, but it's an other product. So to me, the industry doesn't support the idea that you're advancing now, and so I'm wondering where the substantial evidence is for a fact finding that coil rod would be understood by the industry as included within the scope. And again, I would say that it's the evidence produced by the petitioner in this that they consider to be part of the scope. Nobody at the ITC was taught – this issue was not – nobody came during the ITC investigation or the less-than-fair-value investigation and said coil rod is something different. So we have no evidence on the record. We say nobody came forward. That's not true. Seven of the eight people who submitted questionnaires said it was something different. That was the evidence submitted to you. So you can't say nobody came forward. Seven of the eight questionnaires said it's something different. I understand, but the ITC ultimately wrote a scope order that included it. So they didn't – the ITC did not find it. They did not exclude it. They can exclude things from the scope. They excluded other things from the scope. I'm sorry. I do have one more completely different question, and that is I saw your red brief as suggesting that you don't need to look at K1 even in this particular instance. You can just look at the order itself, and in your mind, that ends the inquiry. And I had some trouble with that because the way I read your rule, it seems to contemplate that you always look at K1. And only if it's inconclusive, then you look at K2. But K1 is a necessary part of the scope inquiry. That is correct that the regulation reads that way. However, precedent of this court suggests that in instances when the scope is absolutely clear that you can – you would look first to the scope, and then only if the scope is ambiguous to the K1 factors. And that was this court's holding in McConn and Nail in the recent – that same scheme was repeated in the recent FedMed decision. So based upon this court's precedent, we would say the scope alone is enough. In this case, it doesn't matter because the K1 factors also support our understanding. So we're glad to have you affirm on either ground, Your Honor. May it please the Court, Fred Waite on behalf of defendant-intervenor Vulcan Threaded Products, the petitioner in the underlying investigation. Judge Moore, if I could address the questions that you were advancing to government counsel. When Vulcan submitted its petition, it intended that all products included within the scope that it proposed. It was accepted by the Commerce Department. It was not objected to by any other party. And it was used by the International Trade Commission in its two investigations, preliminary phase and final phase, intended to include all of those products, which we submit include coil rod. When did you stop making coil rod? That's not in the record, Your Honor. The president of Vulcan submitted an affidavit under oath that Vulcan had produced coil rod in the past. That is before he executed the affidavit. Do you know the answer? Do I know the answer personally? I do not know. He also stated that Vulcan has the capability to produce coil rod. And as Your Honor has recognized, the ability of the domestic industry or the actual production of a product by the domestic industry is not a prerequisite for being included within the scope or an anti-dumping order. It's the capability to make it and whether it falls under the clear language of the scope. You're injured because you have the capability to make coil rod? Well, the statute says that material injury can be based on material retardation of an industry. So you could have an industry that's not even in the coil rod or other… There would typically be findings by the ITC in that regard. They wouldn't just say they have the capacity to do it, so we're going to find the material injury. You'd have a lot more on the record establishing the nexus between that and future injury, right? Not necessarily, Your Honor. Often there are products. Coil rod is a good example because it's a subset of subject merchandise in this case. But there are other cases where there can literally be dozens and dozens and dozens of different types of product that fall under the scope. And the U.S. industry may or may not be making that full continuum of products. For example, garment hangers. There's a dumping order on steel wire garment hangers. There are possibly some types of steel wire garment hangers that are not made in the United States. That does not, however, create an exclusion for those garment hangers coming into the United States from a subject country if, in fact, the description of the scope covers those garment hangers. So I would submit here the fact that coil rod is a subset of subject merchandise. There could be dozens of others. You could have dozens of other industries coming in and saying, I make splice threaded rod. I make Humpty Dumpty threaded rod. I make threaded rod that's used in this one unique application. Do you have any reactions to Judge Moore's document here this morning? Well, first of all, the site is taken from the report of the International Trade Commission, which is prepared by the staff and which records all the information submitted to the commission. So you would find in a normal case where there's active participation by respondents as well as the petitioner, the arguments set out by the various parties. The information has been collected. If you look at the written determinations of the commission, both in the preliminary phase and the final phase, I believe the commission makes it crystal clear that the description of the product that it is considering is the like product analysis that it does. And the commission found that the like product is coextensive with the scope. So I'm not sure what weight this does have. I'm not sure, for example, if some of the producers who responded when they saw coil rod thought it was rod and coils. And we're not talking about threaded rod and coils. It's threaded rod in straight lengths. And coil rod is also in a straight length. It's not in a coil. It's a straight length. And I would also point out that, for example, in the petition, we did not... You're saying rod and coils. Are you talking about the raw material that is the starting material for many of these products? Is that what you're referring to? It could be, Your Honor. It could be a finished product. It might be in a coil for some obscure application. But you think that's what they misinterpreted the question as being seven of the eight respondents? I... Misunderstood it in a degree to be an obscure application of a finished product? I don't know, Your Honor, because we just represented the one petitioner in this case. And there was no explanation in those questionnaire responses. I mean, when you look at the other products that are excluded from the scope as certain threaded rod, you're talking about stainless threaded rod, brass threaded rod, as was mentioned by the bench, threaded rod that's threaded on 25% or less of its length. And then one final point, Your Honor. We did not make... May we? I'm sorry? We've exceeded your time substantially, so you can make a quick point, very quick point. It is a very quick point. In the petition, we did not mention a product called double-arming bolts. But double-arming bolts are subject to the order. The Commerce Department conducted a scope review of that. A double-arming bolt is simply a threaded rod with two sets of nuts put on either end, and the importer claimed it's not covered by the scope. We didn't mention double-arming bolts, but the Commerce Department in looking at the... But I assume in that instance, all of the internal documents in the preparation of the final order didn't mention... I don't remember seeing the words double-arming bolts or any description by the industry that that is a different product that was in this record as part of the investigation. That is correct, Your Honor. Yeah, that's the difference. A few minutes left. Thank you, Your Honors. I appreciate your indulgence giving me three minutes to recall. Judge Moore, your point is valid. The reason why it wasn't highlighted is that there is some ambiguity as to what the term is. But what is not ambiguous on this record is that none of the producers who accounted for 80% of production of coil rod in the United States responded to the ITC's questionnaires. Can you just explain why you didn't cite the bombshell that Judge Moore cited here today? There is a citation. You didn't point this out in your briefing to the CIT or to us, right? Your Honor, in... Was it just an oversight or is it because at the time when you saw this in this document, you understood this reference to coil rod in this document to be something other than the coil rod that you're selling? I don't know what it means, and there's no definition as to what that is. And Judge Moore may entirely be right that it is the product that we're talking about. What I know for certain... But do you rely on this document or do you not rely on this document? No, what I'm relying upon is the fact that my client told us who were the producers of coil rod in the domestic market. We looked at the ITC record. We saw that none of them filed responses, and we said, well, hold on a second. Why would your product be covered if none of these guys filed responses? He said, I don't know either. And he said that, you know, there's no... He doesn't know of any other party who makes the coil rod, and that's why we didn't rely upon it because it was ambiguous. But it's entirely possible that Judge Moore may be right on this. It's ambiguous because why? Well, one theory is... You're arguing so far against yourself. I don't understand what you're doing as you stand at the podium right now. Judge Moore, I apologize. I'm just being candid with the tribunal here. No, we want you to do that, but I'm just flabbergasted. What I can say to you, and to answer Judge Chen's question honestly, is that I don't know what the term stands for. It may entirely be correct what Judge Moore is saying, that that's right. It may be correct, but if you're saying there's a good chance it's not correct, this is substantial evidence. They've got a really deferential standard of review. I thought that this was unequivocally clear in your favor. But if you're telling me it's not, and it's ambiguous, and that your own company believes that the word coil rod here may not be reflective of your product, this is a very different case. I don't believe it is a different case because the affirmative evidence on the record establishes that none of the parties that are for certain producers of coil rod... And if I thought that were good enough, that's where my questions would have been, right? I understand. I understand. But there is no pricing product information with regard to coil rod. And your Honor may entirely be correct, and it is highly likely that your Honor is correct. However, to answer Judge Chen's question as to why we didn't cite to it, it's because there is affirmative evidence to cite to that establishes that coil rod and the concrete accessories market were never considered. Affirmative evidence instead of guessing as to what the term may or may not be, and that's reasonable. What is the affirmative evidence? Just the fact that it wasn't specifically discussed and bandied about? No specific discussion. The three producers who are known to be coil rod producers from their files at the SEC and from their advertisements who are coil rod producers were not named by the petitioning companies. None of the pricing products overlap in any way with the pricing or characteristics of coil rod. And the ITC discussion of uses of steel threaded rod are markedly different than the repeated use of coil rod in the concrete accessories market. Four items of affirmative evidence establishing that coil rod is completely different and separate from steel threaded rod in the investigation. And thank you, Your Honor, for your testimony. We thank both counsel. The case is submitted. That concludes the proceedings. Good morning. All rise.